IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

AARON BAKER, C/O Johnathan Dailey          *
             1101 30th St. NW
    Plaintiff,  Ste. 500                    *
             Washington DC 20007
v.                                          *      Case No. _____

SAKS FIFTH AVENUE, INC. 12 E 49th St        *
                         FL 2
    Defendant.           New York NY 10017  *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## COMPLAINT

COMES NOW Aaron Baker, by and through undersigned counsel, and hereby files this Complaint seeking an Order of Judgment against Saks Fifth Avenue, Inc., on the grounds set forth as follows:

## FACTS

1. Plaintiff, Aaron Baker, is a former employee of Bond No. 9, a perfume manufacturer/distributor serving, amongst others, Defendant Saks Fifth Avenue.

2. On or about September 15th, 2012, Plaintiff was contracted to sell Bond No. 9 perfumes at the retail outlet of Defendant located in Chevy Chase, Montgomery County, Maryland.

3. Plaintiff was a top seller during his assignment to Saks Fifth Avenue, and had no complaints of poor performance or sales procedures that were inconsistent with

1

Defendant's business practices or procedures/policies for sales prior to the incident complained of herein.

4. During the first part of May, 2013, a customer named Mr. Jie Wang visited Defendant's Chevy Chase location. Plaintiff interacted with Mr. Wang on a number of occasions regarding sales returns. During one such occasion, Plaintiff gave Mr. Wang his business card asked him if there was anything he could do for him, to just call.

5. Prior to an Electronic Gift Card Event (EGC) dated June 21st, 2012, Mr. Wang called Plaintiff and asked if Saks had approximately $3,000 in different "Kiehl's" stock. Plaintiff approached Mr. Fred Delacruz, the Chief of Asset Protection for Saks, and asked if it was appropriate to agree to this transaction, as most customers do not need $3,000 in Kiehl's products.

6. Plaintiff advised Mr. Delacruz that he suspected the customer may be re-selling the products. Mr. Delacruz advised Plaintiff to bring him duplicate receipts for the transactions. Plaintiff took him the duplicate receipts after the customer left. These receipts reflected the three separate transactions for $1,000 over three days.

7. Before the next EGC Event dated July 10th, 2012, Plaintiff returned to Mr. Delacruz to make certain the transactions similar to Mr. Wang's were approved. Mr. Delacruz advised Plaintiff that as long as not more than six of the same items were on the same receipt, it was approved. He said they would keep an eye on the situation – and unless and until "corporate" flagged the customer as a diverter, then there was no problem executing the transactions and to continue to bring him duplicate receipts.

8. Thereafter, Mr. Wang sent Plaintiff a text asking if he could assist him with a "LaMer" purchase totalling $18,000. Plaintiff approached the assistant store manager, Katie Jaggers, as the customer appeared now clearly to be a diverter. Ms. Jaggers advised Plaintiff that it was not his place to determine if a customer was a diverter. Plaintiff and his colleagues filled 6 separate orders of $3,000 each.

9. The orders, however, were "rung up" incorrectly as a normal sale and not as a pre-sale, thus the reward gift card was not offered. Plaintiff then took the two original receipts for the incorrect orders to Ms. Shiva Jivadi, the department manager at that time. Ms. Jivadi said she would have Ms. Jaggers address it and came back about ten minutes later with two gift cards for the customer.

10. After this EGC Event, Ms. Jivadi was replaced by Ms. Julianne Pulvirenti. Thereafter, Plaintiff and Ms. Pulvirenti discussed Mr. Wang's account and Plaintiff described how the transactions were made. Ms. Pulvirenti stated that she was "good with it" and never raised it again.

11. To err on the side of caution, before the next EGC Event, Plaintiff approached Mr. Delacruz and again asked if the transactions with Mr. Wang were approved. Mr. Delacruz again advised that until corporate objected, it was approved.

12. On or about August 27th, 2012, Mr. Wang then placed another large order with Plaintiff at the next EGC Event. Ms. Pulvirenti printed out an email that was sent from Ms. Patty Hayhurst in the distribution center, requesting approval for Mr. Wang's order of 240 pieces for department 279 Kiehl's. The email was sent to: Katie (assistant buying

manager) Carlean (assistant manager in charge of security and shipping) Terri (store manager) and Shani (shipping and receiving manager).

13. By email, Carlean approved the order.

14. Before the next EGC Event dated September 26th, 2012, Plaintiff received the final order from Mr. Wang for Saks products in excess of $27,000. Ms. Pulvirenti wrote an email to the buying office requesting 72 of 7 different Kiehl's items. She asked Plaintiff how he was going to split the sales and Plaintiff advised that he would ring up 6 of each item for Mr. Wang and 6 of each item for his wife on Monday, Tuesday, Wednesday, Thursday, Friday, and Saturday. Thus we were not exceeding any limits. Ms. Pulvirenti approved the order and emailed the buying office.

15. The buying office then came back and asked for the customer's names. At this juncture, the buying office asked who was approving these orders to an obvious diverter. At this point, "no one knew anything" was the line of defense by Saks employees and managers. Plaintiff was, essentially, disavowed.

16. On or about October 11th, 2012, Plaintiff was called into Defendant's Human Resources office and he was advised that no one in the store had approved these sales and that he was no longer welcome at Saks Chevy because of Mr. Wang's orders.

17. As a result, he was terminated by his employer, Bond No. 9. Plaintiff never benefited financially from any of the sales referenced herein.

## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

18. Plaintiff was employed by Bond No. 9 and placed into Defendant's store to sell perfume on behalf of Defendant and his employer.

19. Defendant knew that Plaintiff was employed by Bond No. 9 and that his breach of any policies and procedures and "ban" from the store would lead to Plaintiff's termination by Bond No. 9.

20. Defendant benefited from Plaintiff's sales - and when Plaintiff repeatedly requested approval of Defendant's management for the transactions, he was repeatedly told that it was approved.

21. When "upper management" asked who authorized the transactions and why were they approved, all of the management personnel falsely denied approving the transactions, throwing Plaintiff under the proverbial bus as a scape goat, banning him from the store.

22. These actions were intentional, malicious and would shock the conscience of the community.

23. After having been falsely accused of violating store and company policy and procedures and being banned from the store, he was terminated from his employment with Bond No. 9 and suffered consequent damages.

## BREACH OF AN IMPLIED CONTRACT/PROMISORY ESTOPPEL

24. Defendant explicitly contracted with Bond No. 9, for whom Plaintiff worked, to provide a sales representative on the Defendant's floor to sell perfume by and on behalf of Defendant.

25. While Plaintiff was not an actual named party to the contract, he relied upon the representations in that contract to his detriment; to wit: by falsely accusing Plaintiff of intentionally violating Defendant's sales policies and procedures, it breached an implied contract of good faith and fair dealing, upon which Plaintiff relied.

26. Defendant was responsible for educating Plaintiff as to appropriate sales procedures and to approve any that were called into question. Again, Plaintiff relied upon Defendant's instruction and approval as to transactions, then Defendant's employees and/or agents lied about the same when upper management questioned Plaintiff's transactions.

27. Because of this reliance upon an implied contract of good faith and fair dealing, to his detriment, Defendant is promissorily estopped from denying the existence of an implied contract.

28. As a proximate cause of the breach of this implied contract, Plaintiff was terminated from his employment and suffered damages.

## DEFAMATION OF CHARACTER/LIBEL/SLANDER

29. Defendant, by and through its employees and/or agents, intentionally lied that they had not approved the various transactions that formed the basis of his ban from Defendant's store and consequent discharge.

30. By written and oral publications to third parties, Defendant falsely accused Plaintiff of egregiously violating Defendant's transactional policies, to inure to his own benefit,

when said accusations were false, they were published to third parties both in writing and orally, and Plaintiff's reputation was harmed and he suffered other damages.

WHEREFORE, for the aforementioned reasons and causes of action, Plaintiff demands Judgment against the Defendant and that he be compensated as follows:

(a) An award of compensatory damages no less than $500,000 for lost wages, loss of employment opportunities and advancement in his career, damage to reputation, emotional distress and pain and suffering; and

(b) An award of punitive damages no less than $500,000 on the grounds that the conduct of the Defendant, by and through its employees and/or agents, was intentional, malicious, outrageous and would shock the conscience of the community.

Respectfully submitted,
LAW OFFICE OF JONATHAN C. DAILEY

By: *[signature]*
Jonathan C. Dailey, Esq.
1101 30th Street, NW
Suite 500
Washington, D.C. 20007
(202) 625-4348
(202) 625-4349 (f)
*Attorney for Plaintiff*

2014 FEB -4 P 1:47
FILED
LORETTA E. KNIGHT
CLERK'S OFFICE
MONTGOMERY CO. MD.

## CERTIFICATE OF ATTORNEY

I hereby certify that I am licensed to practice law in Maryland by the MD Court of Appeals.

By: *[signature]*
Jonathan C. Dailey